UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

STEPHANIE M.,[1]                          )
                                          )
                    Plaintiff,            )
                                          )
            v.                            )          No. 1:21-cv-00503-SEB-MJD
                                          )
KILOLO KIJAKAZI, Acting Commissioner of   )
Social Security,[2]                       )
                                          )
                    Defendant.            )

# ORDER

Plaintiff Stephanie M. ("Stephanie") has appealed the final decision of the

Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying

her September 14, 2019, applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"), alleging a disability onset date of September 30,

2003.  R. (Dkt. 12) at 24.  The applications were initially denied on December 20, 2019,

R. at 129; 133, and upon reconsideration on February 14, 2020.  R. at 139; 142.  The

administrative law judge ("ALJ") conducted a hearing on September 23, 2020.  R. at 46.

During the hearing, the ALJ accepted Stephanie's motion to amend her alleged onset date

to September 14, 2019.  R. at 65.  The ALJ issued a decision on October 8, 2020, that

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the
recommendation of the Court Administration and Case Management Committee of the
Administrative Office of the United States Courts, the Southern District of Indiana uses only first
names and last initials of non-governmental parties in Social Security judicial review opinions.

[2] According to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from his
office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became the
Defendant in this case when she was named as the Acting Commissioner of the SSA.

Stephanie was not disabled and thus not entitled to receive DIB or SSI.  R. at 21; 34.  The Appeals Council denied review on January 8, 2021, and the Commissioner's decision became final.  R. at 1.  On March 4, 2021, Stephanie timely filed this civil action seeking judicial review of the decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Dkt. 1.

For the reasons below, the decision is affirmed.

### Background[3]

The ALJ followed the five-step sequential evaluation set forth by the SSA, *see* 20 C.F.R. § 404.1520(a)(4)(i) to (v)[4], in concluding that Stephanie was not disabled.  Specifically, the ALJ found as follows:

- Stephanie last met the insured status requirements of the Social Security Act on September 30, 2003, her date last insured.[5]  R. at 27.

---

[3] The discussion of Stephanie's medical history and treatment includes sensitive and otherwise confidential medical information that has been thoroughly detailed in the ALJ's decision and the parties' respective briefs.  To the extent possible, we detail here specific facts only as necessary to address the parties' arguments.

[4] The Code of Federal Regulations contains separate, parallel sections concerning DIB and SSI, which are identical in most respects.  Generally, a verbatim section exists establishing the same legal point with both types of benefits.  *See, e.g.*, 20 C.F.R. § 416.920(a)(4)(i)-(v).  We will take care to detail any applicable substantive differences but will not usually reference the parallel section.

[5] Stephanie must prove the onset of disability on or before her date last insured to be eligible for DIB.  *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012); *see also* 20 C.F.R. § 404.131.  The Commissioner contends that Stephanie has effectively withdrawn her DIB application by moving to amend her alleged onset date to well after her date last insured.  Dkt. 16 at 1.  The ALJ's subsequent findings were limited to the period at issue corresponding to Stephanie's remaining SSI claim, beginning with the amended, alleged disability onset date, September 14, 2019, through the date of the decision.  *See, e.g.*, R. at 34; *see also* 20 C.F.R. § 416.335 (SSI is not compensable before the application date, September 14, 2019, which coincides with Stephanie's amended onset date.).

- At Step One, Stephanie had not engaged in substantial gainful activity[6] since the amended, alleged onset date of disability. *Id.*

- At Step Two, she had "the following severe impairments: [g]astroenteritis and diarrhea." *Id.* (citations omitted).

- At Step Three, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. R. at 29.

- After Step Three but before Step Four, Stephanie had the residual functional capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(b) and
- 416.967(b) except: [t]he claimant can frequently climb ramps and stairs, as well as stoop, kneel, crouch, or crawl, but occasionally climb ladders, ropes, or scaffolds. She must work in close proximity to a bathroom and is permitted to be off task ten percent of the time in an eight-hour workday." *Id.*

- At Step Four, there was no past relevant work to consider. R. at 32.

- At Step Five, relying on the of the vocational expert ("VE") and in light of Stephanie's age (51 years of age on the application date), education (at least a high school graduate), and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed in representative occupations like a housekeeper, laundry worker, and film processor. R. at 33.

## **Standard of Review**

Upon review of the Commissioner's decision,

> [w]e will uphold [it] if it applies the correct legal standard and is supported by substantial evidence. *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007)). A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). Our review is limited to the reasons articulated by the ALJ in her decision. *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010).

---

[6] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

*Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  In determining whether the decision was properly supported, we neither reweigh the evidence nor assess the credibility of witness, nor substitute our judgment for the Commissioner's.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## Analysis

Stephanie presents a host of issues for review including "whether the ALJ's [d]ecision denying [her] claim for benefits is supported by substantial evidence."  Dkt. 15 at 1.  She identifies the further issues as:

> Specifically, whether the: (1) [d]ecision is premised on cherry[]picked evidence and failed to provide an accurate and logical bridge to support the critical findings and conclusions; (2) ALJ erred in assessing the medical opinions given that (a) State Agency opinions cannot salvage the [d]ecision, (b) the ALJ erred in rejecting Nurse Practitioner Lu Sclair's opinion, and (c) the ALJ impermissibly substituted her lay opinion for that of the medical sources; (3) residual functional capacity (RFC) is supported given that (a) it does not have a logical bridge, (b) does not accommodate [Stephanie's] conditions, and (c) the ALJ erred in assessing [Stephanie's] and her third-party statements; and, (4) ultimate [d]ecision is unsupported because (a) the ALJ failed to properly consider the vocational expert's (VE) testimony, (b) the requirements of the occupations identified at Step Five are incompatible with [Stephanie's] capabilities, and (c) Plaintiff should have been found disabled pursuant to the Medical-Vocational Guidelines, Rule 201.12.

*Id*. at 1-2.  We address these issues below to the extent necessary to resolve the appeal.

### Prior Administrative Medical Findings

When Stephanie filed her applications, she listed bipolar disorder, depression, anxiety, a small intestine birth defect, and "bad bacteria" in her intestines as her medical conditions that limited her ability to work.  R. at 306.  On appeal, she contends that the

remand is necessary because the ALJ "disregarded" the state agency consultants' assessments that her impairments were not severe, "rejected the only other medical assessment in the file . . . rendered" by her treating source, and impermissibly "crafted an RFC and decision premised on her own layperson's opinion," rather than seeking "an expert's opinion to assess the significance of medical findings . . . ."  Dkt. 15 at 11.

According to the new regulatory scheme for claims such as Stephanie's that were filed on or after March 27, 2017, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),[7] including those from your medical sources."  20 C.F.R. § 404.1520c(a).  The SSA continues to use factors to evaluate the "persuasiveness of medical opinions and prior administrative medical findings" but the "most important factors" to be considered are "supportability" and "consistency."  *Id*.  How those factors were considered are to be explained in the decision.  *Id*. at 404.1520c(b)(2). "Supportability" considers the relevance of "the objective medical evidence and supporting explanations presented by a medical source."  *Id*. at 404.1520c(c)(1). "Consistency" is compared "with the evidence from other medical sources and nonmedical sources in the claim."  *Id*. at 404.1520c(c)(2).  Explicit consideration of the remaining factors is permitted, but not always required, except upon a finding that "two

---

[7] Administrative medical findings are determinations made by a state agency medical or psychological consultant at the initial or reconsideration level about a claimant's case, "including, but not limited to, the existence and severity of [her] impairment(s), the existence and severity of [her] symptoms, whether [her] impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to this subpart, and [her] residual functional capacity."  20 C.F.R. § 404.1513a(a)(1).

or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same . . . ." *Id.* at 404.1520c(b)(2)-(3).  The remaining factors comprise such source's: (1) "[r]elationship with the claimant" including the "[l]ength of the treatment relationship," "[f]requency of examinations," "[p]urpose of the treatment relationship," "[e]xtent of the treatment relationship," and "[e]xamining relationship;" (2) "[s]pecialization;" and (3) "[o]ther factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements."  *Id.* at 404.1520c(c)(3)-(5).

Contrary to Stephanie's contention, the ALJ did not disregard the prior administrative medical findings of the state agency consultants.  Citing to the consultants' reviews at the reconsideration phase, the ALJ explained that the consultants had assessed "no severe impairments and no functional limitations."  R. at 32 (citation omitted).  The ALJ further explained:

> Their opinions are considered persuasive because they are acceptable medical sources that reviewed the initial evidence and their opinions are well supported by the objective medical evidence and the claimant's treatment history.  However, these sources may not have fully considered the claimant's subjective allegations to the extent they are at least reasonably consistent with the record.  Accordingly, I find a range of light exertional level work with proximity to the restroom to be appropriate.

*Id.*

The consultants determined that Stephanie's "other disorders of [her] gastrointestinal system" and her "depressive, bipolar and related disorders" were "non[-]severe" impairments.  R. at 123.  A regulation explains what the SSA meant by "*[n]on-*

*severe impairment(s)*."  20 C.F.R. § 404.1522(a) (emphasis in original).  "An impairment

or combination of impairments is not severe if it does not significantly limit [her]

physical or mental ability to do basic work activities."  *Id*.  "[B]asic work activities" are

"the abilities and aptitudes necessary to do most jobs."  *Id*. at 404.1522(b).  "Examples of

these include":

> (1) Physical functions such as walking, standing, sitting, lifting, pushing,
> pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work
> situations; and
> (6) Dealing with changes in a routine work setting.

*Id*.

On February 12, 2020, the administrative medical consultant determined that

Stephanie's "[p]hysical [impairments were] non[-]severe to prevent function[ing]."  R. at

123.  He explained that there was "[n]o new additional treatment or [follow-ups] since

[the] initial claim," and he was affirming the prior administrative medical finding from

the initial phase.  *Id*.  At the time of the initial review, the record included relevant

evidence of various historical emergency room visits and Stephanie's treatment by a

gastroenterologist, Prodyot Ghosh, M.D.  *See* R. at 89-90 (records from Dr. Ghosh, IU

Health Morgan Hospital, the Indiana Health Information Exchange, and Providence

Health and Services).

Upon referral from her primary treating provider, Lu H. Sclair, N.P., Stephanie

had an initial visit with Dr. Ghosh on April 14, 2019.  R. at 504.  Stephanie reported that

she was "nauseous frequently, with bloating.  She state[d] her food [was] not digesting

properly.  She state[d that] she ha[d] some lower [abdominal] pain before having a

[bowel movement], with dizziness.  These symptoms [had] been ongoing [for nine

years]."  *Id*.  She reported that she had "been extensively evaluated in a tertiary care

facility in Seattle[,] Washington," "a few years ago."  *Id*.  Dr. Ghosh explained that he did

"not have all the records but her previous primary care provider had summarized her

problems and workup in detail."  *Id*.  Dr. Ghosh detailed Stephanie's relevant history:

> On [one] occasion she had a borderline elevation of her serum lipase level.
> She had evaluation with colonoscopy, endoscopy, biopsies for celiac,
> serology for celiac and collagenous colitis biopsies were all negative.  Has
> had imaging studies including CT scans which showed [a] normal pancreas.
> An endoscopic ultrasound was done which showed no evidence of chronic
> pancreatitis.  She does not drink heavy.  She does describe sometimes oily
> stools though I did not see any documentation of steatorrhea.  Has had
> some difficulty gaining weight, has always been slim, most of the weight
> has been around her trunk.  Smokes on a regular basis.  Does not do any
> major recreational drugs.  No specific foods bother her more than others
> though she has seen undigested food in her stools.  As mentioned[,] I did
> not see any small bowel follow-through or video capsule study.
>
> Her initial diagnosis was one of pancreatitis but it appears there is no
> evidence at this on evaluation except for a borderline elevation of lipase
> which is very nonspecific.  Has tried lactose free diet without much relief.  I
> do not believe she [has] ever been on a gluten-free diet.  No family history
> of Crohn's disease, colitis, [or] celiac disease.

*Id*.  Her gastroenterology examination revealed that her abdomen was "[s]oft, non-tender,

[with n]ormal bowel sounds, no masses, [and] no bruit."  R. at 505.  Dr. Ghosh assessed

"[c]hronic diarrhea of unknown origin," and nausea, noting that "[s]he does have an

element of gastroparesis."  *Id*.  He ordered her to "try a strict lactose-free gluten free diet"

and observed that "she will need a small bowel follow-through or video capsule study."

*Id*.

> Stephanie saw Dr. Ghosh again on July 8, 2019.  R. at 507.  Dr. Ghosh recorded:
>
> A small bowel follow-through interestingly did show less than adequate length [of] the small bowel.  She has had no abdominal surgery[,] and her gallbladder taken out[,] and I believe a laparoscopic hysterectomy.  The small bowel follow-through also showed something interesting that the barium reached the splenic flexure [of] the colon in 30 minutes.  Yet when we did a video capsule study it took almost 5 hours for the capsule to reach the cecum.
>
> She has not had a hydrogen breath test or a trial of antibiotics, [but] her story certainly sounds like small intestinal bacterial overgrowth.  I believe at the University of Washington this was suspected but no formal testing [was] done.
>
> On a good day she has 4-5 bowel movements a day [of] watery diarrhea[, and] on a bad day [the bowel movements] could be twice as common.  Undigested food is a very common finding and abdominal pain mainly in the epigastrium with bloating.

*Id*.  The "video capsule study [was] essentially normal."  R. at 509.  The impression of

the small bowel follow-through was explained in more detail as showing a

"[f]oreshortened, decreased length of the small intestine.  This may be congenital in

nature given that the patient does not report a history of small bowel resection."  R. at

512.  Dr. Ghosh's examination found that Stephanie had a "[s]oft, tender, distended[, ]no

bruit[, and t]ypanitic abdomen."  R. at 508.  Dr. Ghosh's assessed "[d]iarrhea," and he

explained that "[t]his may be small bowel bacterial overgrowth from slow small bowel

transit.  What is interesting is the less than adequate amount of small bowel on the barium

x-ray.  I did set her up for a hydrogen breath test . . . ."  *Id*.  There is no evidence in the

record that Stephanie returned to Dr. Ghosh for further treatment or had the breath testing completed to further evaluate possible bacterial overgrowth.

At the initial phase, the medical consultant expressly reviewed Dr. Ghosh's examination findings and the diagnostic testing demonstrating that Stephanie had an abnormally short, small intestine.  R. at 91-92.  But the consultant determined that she did not have a severe impairment that prevented her from performing basic work activities.  R. at 92.  And as explained above, that assessment was affirmed at reconsideration.

Following the consultants' reviews, minimal treatment evidence was added to the record, consisting of five primary care visits when Stephanie predominantly saw Nurse Practitioner Sclair.  R. at 697-710.  The only updated diagnostic testing was an x-ray of Stephanie's left foot that showed no fracture but soft tissue swelling consistent with a recent injury causing pain in her fifth toe.  R. at 711.  The Seventh Circuit has explained that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment") (additional citation omitted)).  The Seventh Circuit has also "said repeatedly that an ALJ may not 'play[] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ruling that the ALJ erred in failing to submit

the claimant's first MRI in 11 years to medical scrutiny and in interpreting the results himself).  However, an ALJ may rely on a dated assessment when diagnostic imaging "post-dating the state agency consultant's report show[s] only mild changes in the claimants' respective conditions." *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021), *as amended on reh'g in part* (June 21, 2021) (citing *Keys v. Berryhill*, 679 F. App'x 477 (7th Cir. 2017); *Olsen v. Colvin*, 551 F. App'x 868 (7th Cir. 2014)).  Here, the updated evidence after the consultants' reviews did not contain any new diagnosis concerning Stephanie's gastrointestinal problems, any significant diagnostic testing, and virtually no relevant clinical findings that differed from the existing evidence.[8] Accordingly, all the significant objective evidence was submitted to expert scrutiny, and the ALJ was entitled to rely on the consultants' assessments that the objective evidence of Stephanie's physical impairments did not establish functional limitations.

Similarly, the ALJ found that the opinion of the consultative psychological examiner, Michelle L. Koselke, Psy.D., was "persuasive," and she explained that her RFC finding—that did not include any express mental limitations—was "appropriate" considering Dr. Koselke's assessment.  R. at 32.  After an examination on December 12, 2019, Dr. Koselke gave a medical source statement:

> [Stephanie] appears capable of understanding, carrying out, and remembering instructions of moderate complexity, sustaining concentration and persisting in work-related activities at a reasonable pace.  Her general fund of information, abstract reasoning skills, mental calculation skills, and judgment are adequate.  She appears capable of responding appropriately to

---

[8] In general, to the extent Stephanie relies on distinguishable case law in her brief, *see, e.g.*, Dkt. 15 at 11 (citing *Kevin George K. v. Berryhill*, 2019 WL 2122987, at *8 (N.D. Ill. May 15, 2019)), we will not discuss such authorities in this Order.

> supervision, coworkers, and pressures in a work setting.  Her ability to
> perform daily and work activities appears to be primarily impacted by her
> physical health problems.  She appears capable of managing funds.

R. at 681.

At reconsideration, the reviewing psychological consultant agreed that Dr.

Koselke's opinion was consistent with and supported by the totality of the medical

evidence, and any work-related limitations related to Stephanie's physical issues would

require a separate evaluation.  R. at 124.  The consultant considered Stephanie's

diagnosed mood disorder and anxiety disorder with panic attacks.  *Id*.  The consultant

explained that Stephanie did a variety of activities of daily living when she was

physically able, she needed no help or encouragement to do her household activities, she

paid attention as long as needed, got along with others, followed instructions well, and

did the best she could with changes.  *Id*.  The consultant's administrative medical finding

was that Stephanie's mental "[f]unctioning [was] no more than mildly impaired."  *Id*.  The

regulatory definition of "mild," effective for cases filed after January 17, 2017, specifies

that a claimant's "functioning in [the] area independently, appropriately, effectively, and

on a sustained basis is slightly limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1,

12.00(F)(2)(b).  The Seventh Circuit has also determined that minor limitations—like a

limitation to following moderately complex instructions—do need to be included in the

RFC when they would have no effect on the outcome of the case.  *See Denton v. Astrue*,

596 F.3d 419, 423-25 (7th Cir. 2010).  And it is incumbent on an appellant to develop an

alleged, material omission by identifying a specific limitation that was both supported

and neglected.  *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019).

Stephanie asserts that the ALJ's RFC finding that included "no limitations dealing with others, applying information, or in dealing with changes in the work setting," is inconsistent with her other findings that Stephanie was mildly limited in each of the four broad domains of mental functioning.[9] Dkt. 15 at 19.  She also contends that remand is necessary for further consideration of her inability to handle stress.  *Id*. at 19-20.

However, we do not find the ALJ's decision to be either inadequately explained or unsupported.  For example, the ALJ explained that "[a]lthough [Stephanie] testified that being in a crowd of people makes her anxious, she reported she has no problems getting along with family, friends, or neighbors."  R. at 28 (citation omitted).  The ALJ also explained that "she has no problems following spoken instructions."  *Id*.  When Stephanie filled out forms describing her functioning to the SSA, she indicated that her impairments affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and completing tasks, but not talking, hearing, seeing, her memory, understanding, following instructions, using her hands, or getting along with others.  R. at 277.  The ALJ considered Stephanie's anxiety-related allegations throughout the decision including when evaluating her RFC.  For example, the ALJ noted that Stephanie had

---

[9] When assessing the "paragraph B" criteria, the ALJ found that the Stephanie had mild limitations understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself.  R. at 28-29.  The limitations identified in the paragraph B criteria are used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process.  20 C.F.R. § 404.1520a(d)-(e).  However, the RFC assessment used at Steps Four and Five requires a more detailed assessment by itemizing various functions contained in the broad areas of functioning found in paragraph B of the adult mental disorder listings.  Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184, at *4.

reported to Nurse Practitioner Sclair that she "often ha[d] anxiety, which inspire[d] episodes of cramping and diarrhea."  R. at 31 (citation omitted).

The Seventh Circuit has held that an ALJ may rely on consultant's narrative describing the functional limitations that were supported by the record evidence.  *See, e.g.*, *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021).  Here, the ALJ relied on Dr. Koselke's narrative opinion that explicitly considered Stephanie's abilities to get along with others and respond appropriately to work pressures but found those abilities adequate for most jobs.  Dr. Koselke assessed a limitation only with Stephanie's ability to apply information that she could carry out moderately complex instructions.

According to the VE, even if Stephanie were further limited to occasional interaction with the public, the representative occupations the ALJ relied on at Step Five would remain viable.  R. at 66-67.  The VE testified that a further limitation to occasional interaction with others when combined with a limited ability to stand and walk—for example, in the ALJ's hypothetical, for four hours total in eight-hour workday—would preclude all work at the light exertional level.[10]  R. at 67.

To that end, Stephanie also contends that the ALJ "ignored the evidence of [her] vertigo and anxiety related to her balance issues," even though the ALJ expressly concluded that vertigo was not a severe impairment.  R. at 22-23 (citing R. at 27).  The ALJ explained that Stephanie had "not alleged and the record does not support that the

---

[10] Based on Stephanie's age, education, and work history, the Medical-Vocational Guidelines would direct a finding of "[d]isabled" if she were unable to perform work at the light exertional level.  *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 2, Rule 201.12.

claimant's migraines, vertigo, bronchitis, sinusitis, and urinary tract infection . . . cause[d] more than minimal work-related difficulties." R. at 27. Stephanie has not presented any objective evidence that she had difficulty with balance specifically or standing and walking more generally. Accordingly, we do not find any basis to conclude that the ALJ erred by relying on the prior administrative medical findings that Stephanie did not have material functional limitations based on the objective evidence.

### Nurse Practitioner Sclair's Opinion

In addition to Nurse Practitioner Sclair's limited treatment records, the evidence that was submitted after the administrative medical findings included her medical opinions.[11] The ALJ addressed her medical opinions:

> In a medical assessment, Nurse Sclair, opined the claimant had moderate limitations in judgment for simple work and complex work due to abdominal pain, frequent trips to the restroom, . . . dehydration, and anxiety. Thus, she opined the claimant had extreme limitation in interacting with the public, moderate limitation in interacting with supervisors and coworkers, and extreme limitation in responding appropriately to routine changes. She opined the claimant would be off[ ]task 25 percent of the time in an eight-hour workday (8F). In a physical assessment, Nurse Sclair opined the claimant could not do lifting, can sit for four hours, and only walk one to two hours. She opined the claimant would be restless and require change[s] in position due to anxiety, could occasionally climb ramps and stairs, and would require a quiet environment due to headaches and migraines. She opined the claimant would be off task 20 percent of the time (Ex.7F). I consider the opinion[s] of Nurse Sclair to

---

[11] For claims filed on or after March 27, 2017, a "Licensed Advance Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice" is an "acceptable medical source." 20 C.F.R. § 404.1502(a)(7). Although, any "individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law" is considered a "medical source." *Id*. at 404.1502(d). A "medically determinable impairment" must be "established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. For claims filed on or after March 27, 2017, any "medical source" can provide a "medical opinion." 20 C.F.R. § 404.1513(a)(2). Previously, only "acceptable medical sources" could give a "medical opinion." 20 C.F.R. § 404.1527(a)(1).

be less than persuasive as they are inconsistent with her treatment notes.  In July 2020, Nurse Sclair found the claimant was positive for anxiety, but no depression and no headaches.  She further found the claimant had no abdominal pain, no nausea, no diarrhea, no vomiting, and no constipation (Ex.10F/2).  Overall, her treatment notes do not document sufficient support for the limitations she has assessed.  Accordingly, I am not persuaded the claimant requires greater limitations than those enumerated in the above stated residual functional capacity.

R. at 32.

The ALJ properly considered the consistency factor when she explained that Nurse Practitioner Sclair's opinions were not sufficiently supported by her treatment records.  On November 7, 2019, Stephanie saw Nurse Practitioner Sclair for eczema, and she reported "[n]o abdominal pain, no nausea, no vomiting, no diarrhea, no constipation," "[n]o headache," "[n]o anxiety, [and] no depression."  R. at 708-09.  Her examination was completely unremarkable including normal gastroenterology, extremity, musculoskeletal, and psychiatric signs.  R. at 709.  On January 6, 2020, Stephanie saw another nurse practitioner at the same treating provider including for some relevant complaints of "headache" and "body aches," but in the context of being diagnosed with acute bacterial sinusitis and acute bronchitis with a cough.  R. at 705-06.  On May 1, 2020, Stephanie returned to Nurse Practitioner Sclair with complaints of "sinus pressure, [headache], left ear pressure, [and] dizziness [for] about [two] weeks."  R. at 700.  Her examination was again normal including a "[s]oft, non-tender, [and] non-distended" abdomen.  R. at 701.  Stephanie reported positive anxiety recorded in the review of systems section of the treatment notes but her psychiatric examination was normal including "appropriate mood

and affect." R. at 700-01. Nurse Practitioner Sclair diagnosed chronic sinusitis and

benign positional vertigo. R. at 701. She explained:

> [Stephanie was] seen in [the] office for chronic issues of sinus pressure and
> [benign positional vertigo.] We have trialed multiple treatments and
> medications. She was offered a sinus surgery years prior but never did it as
> did not want to bother. [She] unfortunately continues to smoke [and] I have
> reminded [her] that this makes vertigo and sinus issues worse and likely
> increases exacerbations for infection[.]
>
> [She] otherwise has chronic anxiety and chronic [abdominal] pain with
> redundant bowel . . . all of these are well evaluated.

R. at 700. On July 23, 2020, Stephanie visited Nurse Practitioner Sclair again with

complaints of "bladder spasm, pain with voiding, [and] lower back pain [for one] week."

R. at 697. Stephanie reported that she was planning on getting "her nasal concerns fixed

in the next month. This will entail a correction of her septal deviation." *Id*. Her

examination was again normal except a "vaguely tender suprapubic area," though her

abdomen was "non-distended." R. at 698. Nurse Practitioner Sclair diagnosed urinary

pain and a history of a urinary tract problem. R. at 698.

Nurse Practitioner Sclair's treatment records are not consistent with the breadth of

limitations that she assessed. For examples, Nurse Practitioner Sclair indicated that

Stephanie could never lift any weight, only occasionally—up to one third of an eight-

hour workday—use her hands for fingering and feeling, never balance, and never operate

a motor vehicle. R. at 683-87. She also assessed that Stephanie had an "extreme"

limitation, defined as being "[u]nable to function," responding appropriately to usual

work situations and to changes in a routine work setting. R. at 691-92. There is no

indication that Stephanie had problems using her fingers or feeling with her hands. As

noted above, she reported to the SSA that her impairments did not affect her use of her hands.  Stephanie testified that she needed to lie down because of dehydration associated with frequent bowel movements, and she was often in so much pain with bowel movements that she felt like she was "going to pass out."  R. at 58-59.  She also testified that she could not bend down to clean the bathtub, but she stated, "I can do a little sweeping.  I can do broom sweeping.  I can, you know, do the dishes but most of the time mom puts those away. My mom and my friend do help out a lot, you know, on the cleaning stuff at the apartment."  R. at 62.  The ALJ asked, "I believe that your primary care doctor – well, she's a nurse practitioner – Lu Sclair – she mentioned that you had trouble reaching and using your hands.  What causes that issue?"  *Id*.  Stephanie responded, "Well, it's not necessarily the hand.  It is, like, reaching for stuff.  When I reach it hurts my belly.  My belly, I know I keep repeating that, but it's so tender.  So when I reach up it makes my belly hurt worse than it normally does."  *Id*.  Stephanie did not testify to having any functional issues with balance or vertigo other than perhaps what could be implied while she was in pain and dehydrated with frequent bowel movements.

The minimal treatment evidence from Nurse Practitioner Sclair also fails to document the severity that she assessed concerning the impairments that she did treat.  Except for one instance of vague tenderness that correlated with bladder spasms and a urinary tract problem, there were no examinations findings showing any abdominal abnormalities, and no mental status examination findings demonstrating anxiety, let alone severe anxiety.

Stephanie alludes to Nurse Practitioner's "long relationship" with her, "*years* of treatment," and "regular and frequent examinations throughout those years." Dkt. 15 at 14 (emphasis in original). But the record does not include the evidence, testing, and examination findings from that longstanding treatment relationship. The burden is on the claimant to produce the evidence that substantiates her claim. *See, e.g.*, *Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005). The Seventh Circuit has also held that "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making [her] strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987); *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). Here, the record shows that Stephanie's gastroenterology problems were largely evaluated while she was living in Washington, and while Nurse Practitioner Sclair referred her to Dr. Ghosh upon her return to Indiana, Dr. Ghosh indicated that he received her relevant history from her previous primary care provider. Nurse Practitioner Sclair apparently also reviewed the results of Dr. Ghosh's diagnostic testing. *See* R. at 684 (describing the redundant bowel diagnosis established by CT imaging). Even assuming that she reviewed all of his treatment records, that evidence was also reviewed by the medical consultants. The ALJ expressly found the consultants' assessments more consistent with Stephanie's treatment history. The ALJ was permitted, if not obligated, to evaluate Nurse Practitioner Sclair's opinions based on the record that was before her, rather than defer to an unsubstantiated treatment history.

The ALJ should have provided explicit consideration to the supportability factor when evaluating Nurse Practitioner Sclair's opinion.  But had the ALJ done so, the supportability factor would not have resulted in a finding that Nurse Practitioner Sclair's was opinion more persuasive.  Nurse Practitioner Sclair repeatedly referenced Stephanie's subjective complaints as supporting her assessments.  Stephanie's inability to lift any weight was attributed to "abdominal pain."  R. at 683.  She could not maintain exertional positions because she was "often restless" because of "anxiety."  R. at 684.  She could not use her hands because of "severe anxiety about physical activity inspires diarrhea and abdominal pain."  R. at 685.  She had "[a]nxiety about falling [with] stooping, kneeling, [and] crawling."  R. at 686.  The only exception was Nurse Practitioner Sclair's reference to the CT imaging.  R. at 684.  But again, that imaging was submitted to expert scrutiny.

Nurse Practitioner Sclair's treatment records show that she completed the medical opinion forms based on a "phone visit" with Stephanie, during which Stephanie detailed her subjective complaints about her inability to work.  R. at 702.  Assessments that a claimant "cannot sit, stand or walk for any sustained period of time," can be discounted particularly when it is "ambiguous whether the statement represents [her] own clinical impression of [the claimant's] objective limitations . . . ." *Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021).  "[A]n ALJ does not owe any deference to the portion of a treating [provider's] opinion [that is] based solely on the claimant's subjective complaints." *Id*. (citation omitted).  Accordingly, the ALJ was permitted to reject Nurse Practitioner's Sclair's opinions so long as the ALJ's evaluation of Stephanie's statements concerning her subjective symptoms reflect the deferential standard.

## Subjective Symptoms Evaluation

When evaluating a claimant's subjective statements about the intensity and persistence of symptoms, the ALJ often must make a credibility determination concerning the limiting effects of those symptoms. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Reviewing courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)). If a fully favorable determination cannot be made based solely on the objective medical evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms . . . ." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *6-8. This includes the regulatory factors relevant to a claimant's symptoms, like daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. *Id*. at *7-8; 20 C.F.R. § 404.1529(c)(3). The ALJ need only "discuss the factors pertinent to the evidence of record." SSR 16-3p, 2017 WL 5180304, at *8. The ALJ should also consider any inconsistencies within the evidence, including conflicting statements made by the claimant and others like treating sources. 20 C.F.R. § 404.1529(c)(4). The ALJ may also consider inconsistencies between the severity of symptoms that a claimant described to the SSA compared with when she was seeking treatment. *See e.g.*, *Sienkiewicz v.*

*Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005).  And the ALJ is required to credit the

limitations established through subjective statements only to the extent she finds them

credible.  *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009).

Along with her request for reconsideration, Stephanie reported that her physical

conditions had changed sometime around approximately January 12, 2020.  R. at 118.

She explained:

> I[']ve gotten to the point of my life that I cannot make plans.  I try to eat
> healthy.  Every day is painful now.  I rarely am able to go out.  My diarrhea
> has gotten to the point where I now have accidents daily.  The cramping is
> miserable [and] constant.  Even liquids cause violent diarrhea.  I have
> headaches almost daily.  I do not sleep well[.]  I go to the bathroom 10-12
> times a day.  The spasms are so bad.  I cannot work because I am so weak,
> so exhausted.  My head pounds.  My daily life is similar to a long
> continuous flu.  It[']s scary.  I cannot provide for myself.  I cannot stay in
> the same position long.  I ache all the time.  I cannot concentrate on
> anything.  I love to read and I cannot do that anymore.  My body craves
> sleep.  Even riding in a car is miserable, the motion is nauseating, increases
> the pain of my headache.  It is not that I do not want to work, I no longer
> can.  Movement is pain.  Food is pain.  My stomach is so bloated all the
> time.  I look like I am pregnant[.]

*Id*.

> The ALJ summarized Stephanie's subjective allegations:

> The claimant testified she is unable to work due to small bowel syndrome,
> which causes her to have "blow outs" several times a day.  She explained
> that after eating, her food is not processed properly, and she has to use the
> toilet.  She stated she has accidents daily and sometimes at night as well,
> for which she wears adult undergarments.  After using the restroom,
> she explained she is tired and needs to go lay [sic] down.  As a result of
> these impairments, the claimant stated she is not able to engage in
> substantial gainful activity.

R. at 30.  The ALJ concluded:

> After careful consideration of the evidence, I find that the claimant's
> medically determinable impairments could reasonably be expected to cause
> the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not
> entirely consistent with the medical evidence and other evidence in the
> record for the reasons explained in this decision.

*Id*. The ALJ explained the limitations that she credited:

> As for factors that precipitate and aggravate the claimant's symptoms, she
> testified that being in a crowd of people aggravates her anxiety and eating
> aggravates her stomach issues.  However, I considered the claimant's
> allegations to the extent they are reasonably consistent with the
> objective medical evidence, clinical findings, and her treatment history by
> limiting her to only a modest range of light exertional level work with close
> proximity to the restroom.  At times, the claimant reported that bending
> causes her pain.  I have added some postural limitations to accommodate
> this symptom.  However, the frequency with which the claimant alleged to
> need the restroom is not supported by the evidence.

R. at 31.  As detailed in the first section of this order, Stephanie reported to Dr. Ghosh

that she frequently needed to use the restroom four to five times daily and up to twice that

often on a bad day.  But she did not continue specialized treatment to thoroughly address

the cause of her symptoms.  She did not seek any relevant treatment in conjunction with

the changes to her conditions that she detailed for the SSA at the reconsideration phase.

She also made very few relevant complaints to Nurse Practitioner Sclair while she was

seeking treatment.  She never reported daily headaches, daily accidents, regular

dehydration, and the need to lie down each day from exhaustion.  During her phone

conversation for the purpose of completing disability paperwork, she reported that she

had not been able to maintain work despite attempts because she was in the bathroom two

to three hours a day even with a part-time schedule.  R. at 702.  But she also reported that

she was under a great deal of stress at the time related to her marriage ending.  *Id*.

During the phone interview, she told Nurse Practitioner Sclair that she "still ha[d] daily abdominal pain and cramping [and] sometimes goes days without [a bowel movement] and then [would have] what she calls a 'blow out.'"  R. at 703.  There is little to no support from examination findings for the degree of bloating and distention that she alleged.  The contemporaneous evidence during the period at issue, *see* note 5, does not support the severity of symptoms that Stephanie has alleged, and the ALJ's relevant conclusions were reasonable in light of the record.

Stephanie contends that the ALJ used her activities of daily living impermissibly without considering that she could complete them with "*immediate, unregulated* access to a restroom at all times" and not held to competitive productivity standards.  Dkt. 15 at 25 (emphasis in original).  But the regulations instruct the ALJ to consider daily activities, and the reviewing psychological consultant expressly relied on Stephanie's activities in addressing her alleged mental limitations.

Stephanie also contends that the ALJ's RFC finding concerning access to a bathroom was vague, and she did not adequately explain her related determinations that breaks in her work routine would not render Stephanie off task for more than ten percent of the workday or that she would not exceed the competitive tolerances for absences.  Dkt. 15 at 20-22.  But the ALJ solicited relevant testimony from the VE that an "individual [who] needs to be near a bathroom, within walking distance of a bathroom," could still perform the representative occupations so long as she did not exceed competitive employers' tolerances that a worker cannot be off task for more than ten percent of the workday or absent more than one day per month.  R. at 66-69.  The

treatment records fail to reflect any regular treatment for acute symptoms related to Stephanie's medically determinable impairments that would cause more frequent absences. And the ALJ explained why she did not find Stephanie's subjective symptoms to be supported by the record. We see no reason to require the ALJ to describe with precise calculations how the breaks that she credited as consistent with the record would not exceed ten percent of the workday.

Stephanie contends that the ALJ's finding that she would not be off task more than ten percent of the workday is a "generic limitation" that "is not rooted in the evidence." Dkt. 15 at 21 (citing *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017)). In *Lanigan*, the Seventh Circuit held that there was no "logical connection" between the evidence and the ALJ's finding that the claimant would be off task less than ten percent of the workday, which according to the VE was all the amount of off-task time that employers would tolerate in the competitive economy. *Id*. The court reasoned that the ALJ had not explained if or how a reviewing consultant's opinion supported the limitation, nor why that opinion should be given more weight than a treating counselor's relevant assessment. *Id*. at 563-64. The court explained that only the treating counselor's assessment postdated the claimant's involuntary commitment related to his mental impairments. *Id*. at 564. And the ALJ's "selective reading" of two years of the counselor's treatment notes was not "persuasive" in light of frequent "weekly or biweekly" treatment for mental complaints that included the claimant having "black[] out[s]" when he could not remember periods of time. *Id*. Here, by contrast, as detailed above, the ALJ explained how Nurse Practitioner Sclair's relevant opinion was not

consistent with the record, including Stephanie's limited treatment and relevant complaints during the period at issue, and the consultants had the benefit of reviewing the most pertinent evidence.  Accordingly, we do not find the ALJ's subjective symptoms evaluation to be patently wrong, nor do we find the ALJ's written decision legally deficient.

### **Conclusion and Order**

For the reasons explained above, the Commissioner's decision is AFFIRMED. Final judgment shall issue by separate order.  Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.

Date: _5/26/2022_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Lu Han
SOCIAL SECURITY ADMINISTRATION
lu.han@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov

Adriana Maria de la Torre
THE DE LA TORRE LAW OFFICE LLC
adriana@dltlawoffice.com